**TOMAC, INC., Plaintiff,**

v.

**The COCA–COLA COMPANY, Defendant.**

**No. CV 75–924–DWW.**

United States District Court,
C. D. California.

June 3, 1976.

Blecher, Collins & Hoecker, Maxwell M. Blecher, Daphne M. Stegman, Ronald W. Reagin and Ralph M. Braunstein, Reagin & Braunstein, Inc., Los Angeles, Cal., for plaintiff.

O'Melveny & Myers, Donald M. Wessling, Keith H. Beyler, Los Angeles, Cal., for defendant.

ORDER GRANTING JUDGMENT n o v
AND/OR NEW TRIAL

DAVID W. WILLIAMS, District Judge.

This private antitrust action challenges the distribution system of the Coca Cola Company through franchised bottlers, which designates a defined geographical territory within which each bottler must confine his sales of product. The case in-

volves only soft drinks sold by bottlers in returnable or non-returnable packages, not fountain products such as might be dispensed over the counter at a drugstore or in a cafe.

For over 70 years the Coca Cola Company has maintained this distributive system in one form or another. Now it has approximately 700 bottlers under perpetual contracts. Some are small low-volume entrepeneurs who service rural areas—others are large corporate operators who own huge plants and who, over the years, may have extended their areas by purchasing the contracts of neighboring contiguous franchisees. No bottler is limited to packaging Coca Cola products, and many also handle 7-Up, Pepsi Cola, Dr. Pepper and other competing soft drinks within their territory.

It has been held that the manufacturer of a finished product who parts with title, dominion or risk with respect to the article when he sells it to his wholesaler or retailer, violates the Sherman Act if he attempts to confine that wholesaler or retailer's sales to a fixed territory. *United States v. Arnold Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

Not all location clauses are "per se" illegal. *GTE Sylvania, Inc. v. Continental T.V. Inc., et al.,* 537 F.2d 980 (9th Cir., 1976); *Seagram and Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71 (9th Cir., 1969). "(E)ach case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, and that the opinions in those cases must be read in the light of their facts and of a clear recognition of the essential differences in the facts of those cases, and in the facts of any new case to which the rule of earlier decisions is to be applied." *Hawaiian Oke* at 79 citing *Maple Flooring Mfrs. Ass'n. v. United States,* 268 U.S. 563, 579, 45 S.Ct. 578, 69 L.Ed. 1093 (1925).

Defendant contends that the nature of its business removes it from the strictures of *Schwinn* and its progeny because it does not deliver a finished product to its bottlers and does not lose control over what its bottlers do with the product delivered to them.

What occurs is that Coca Cola Company manufactures syrups and concentrates from secret formulae which it ships in vats to its bottlers, who then follow carefully prescribed processes of mixing the syrup with other ingredients before packaging it for the market in bottles or cans. Each bottler must own a great deal of equipment and machinery designed to mix the product, heat and then chill the ingredients, wash and then sterilize the bottles, and then fill and cap the package and put them in cases for delivery by its route drivers. A potentially huge investment of capital is thus required of the franchisee to provide the needed plant, equipment and trucks. The Coca Cola Company constantly monitors the mixed and packaged product of its franchisees by means of a roving team of company inspectors. A typical route driver for a bottler will supply product to supermarkets, small grocery stores, liquor stores, gasoline stations and public buildings on his route. Some of these outlets sell the drinks from refrigerated vending machines, another item of cost to the bottler. It is a matter of some importance, then, to a prospective franchisee to be assured that he will have every market and store in his territory to supply product to before he is willing to make the investment required of him to become a bottler. Moreover, he is required by his contract to vigorously promote the sale of the product in his district and this calls upon him to pay for necessary area advertising.

Tomac, Inc. is owned by Messrs. Heckenkamp and McFarland (hereafter H. and M.), its sole stockholders. It was formed for the purpose of bringing this lawsuit after what it knew would be a refusal by the Coca Cola Company to permit its tiny bottler in Taft, California (whose territory included the small town of Taft and an area 15 miles surrounding) to sell over 2 million cases of Coca Cola to plaintiff who, to the knowledge of the Taft bottler, would then deliver the product to giant food store chains outside of Taft's area for warehouse distribution to their supermarkets located over the State of California. In past years, H. and

M. had worked as food brokers, separately and together, and had sold a variety of products, such as soap and canned food, to markets and food chains. Neither had ever sold Coca Cola product; neither had ever been a soft drink bottler, and neither has announced an intention through this litigation or otherwise to become a soft drink bottler. It is strongly suggested by the evidence in this case that H. and M. are the tools of the several large food market chains in this state, now buying their Coca Cola product from local bottlers who can sell only to those supermarkets located in their territory. The food chains would prefer buying the product in vast quantities from any Coca Cola bottler they desired, and then warehousing the cases for distribution on their own trucks to their myriad of retail stores over the state. The chain markets, then, are the invisible plaintiffs in this action.

In a concert of action, Tomac's two owners got the Alpha Beta Markets and Certified Grocers Company to give them orders for over 2 million cases of Coca Cola, knowing that Tomac was not a franchised Coca Cola bottler. The brokers took these inviting offers to purchase to the rural Taft bottler, who decided to knowingly violate his franchise contract and fill the order if he could get defendant to deliver him sufficient syrup. It didn't take defendant long to discover that Taft's business had suddenly increased beyond all previous company history, and when it learned that Taft was providing a customer with product which was finding its way into other bottler's territories (thus depriving the other bottlers of some of their largest customers), it refused to furnish the Taft bottler with the syrup. Thus deprived of the brokerage fee they hoped to reap from delivering Taft soft drinks to the chain market warehouses outside Taft's district, H. and M. brought this suit to strike down Coca Cola's territory bottling franchise system as anti-competitive and to recover damages for the lost profits they would have received from the two orders. After a two-week trial a jury returned a verdict for plaintiffs in the sum of $540,100 before trebling and before the fixing of attorneys' fees. Defendants have moved this Court to set aside the jury verdict and enter a judgment in favor of defendant notwithstanding the verdict.

Much has been said about the inadequacy of the jury system to accommodate itself to some of the complexities of modern litigation. Even the Supreme Court has confessed its problems in examining difficult economic problems.[1] It may be true that jurors are best able to pick from contested facts in a bank robbery case or a narcotic violation, but there seems less logic in entrusting to laymen economic and legal problems which are wound in strange and confounding theories familiar only to that small set of lawyers and judges who have spent years trying to unravel and settle its mysteries. Whether a distributive practice of a large soft drink manufacturer through its franchised bottlers violates the Sherman Act, or may be said to be permissible under the rule of reason as not anti-competitive is a question, the solution of which depends upon an understanding of the economic forces of a complicated marketplace. The decision is too important and far reaching to be left to the misconceptions and misunderstandings of inexperienced jurors. The verdict shows that this jury did not understand the economic facts that were important to a correct result.

The verdict is an example of a serious miscarriage of justice, possibly affecting small and large investors of millions of dollars in a business which does not offend the Congressional purpose for enacting federal antitrust laws. This business should not be uprooted because a few of its supermarket wholesale buyers would prefer that defendant conform to their preference of a manner of delivering product to them. Coca Cola's method of product delivery is not anti-competitive nor illegal—it is merely in-

---

1. "The fact is that courts are of limited utility in examining difficult economic problems." *United States v. Topco Associates,* 405 U.S. 596, 609, 92 S.Ct. 1126, 1134, 31 L.Ed.2d 515 (1972).

convenient to Alpha Beta and Certified Grocers.

A decision that a company is violating federal antitrust laws is one which must be bottomed on hard economic evidence. That evidence should come from expert witnesses who have fine qualifications, have studied this particular industry and are able to give sound and detailed reasons why they believe this business impacts anti-competitively upon interstate commerce. Rhetoric of lawyers is not a substitute for evidence. Plaintiff afforded this jury no evidence of an economic nature which would support or justify this verdict. On rebuttal, plaintiff produced its first witness to support its contention that there was no competition, or illegal restraints on competition between bottlers of defendant's product—an economics professor whom plaintiff's counsel had first discussed the case with the evening prior. Dr. Klein is probably a distinguished academician, but his total knowledge of the intricate problems of this case came to him a few hours before he took the witness stand and by his own admission, he knew nothing about the economics of the soft drink distributing system. He had made no studies of the industry structure and had not reflected upon the manner in which it might have impacted upon free competition. A jury which based its far reaching decision upon Dr. Klein's contribution, simply did not base its verdict on evidence.

The contract provision Coca Cola has with its bottlers whereby the latter are given the exclusive right to manufacture and merchandise soft drinks from plaintiff's syrup within a defined territory is "vertical" and not "horizontal" in character in that they do not constitute agreements "between competitors at the same level of the market structure." *United States v. Topco Associates, Inc.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972); *United States v. Sealy, Inc.,* 388 U.S. 350, 352, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967); *White Motor Co. v. United States,* 372 U.S. 253, 267, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). Vertical territorial restrictions are not always unreasonable per se. *Topco,* supra; *United States v. Arnold Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). They are subject to review according to the rule of reason as set forth in *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), and *Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1919). If the arrangement of territorial exclusivity in this case restrains trade, it must be found to be unreasonable before it violates the Sherman Act. *Anderson v. American Automobile Association,* 454 F.2d 1240, 1244 (9th Cir., 1972).

It must be noted that defendant does not manufacture a finished product and ship it to its franchisees under circumstances where it transfers title to the product and does not retain dominion and control over its continued journey to the consumer. Defendant sells a syrup to the bottler; they then become the manufacturer of a finished product with the aid of a sizeable inventory of equipment and machinery designed to mix, package and deliver the drink to the consumer. Defendant's watchful eye is continually on the bottler to insure proper mixture of product, proper cleanliness, uniform packaging and vigorous promotion.

I conclude that the territorial covenant of defendant with the Taft Bottling Company is reasonable because it is necessary to promote a legitimate business purpose; it provides a necessary incentive to the bottler to make a substantial investment needed to equip himself to compete successfully, and it enhances, rather than has a detrimental effect on competition.

There are a number of factual distinctions which justify this case not being judged by the holding of *Schwinn.* The individual bottlers are not primarily wholesalers or retailers, although some of both activities are done by them. They are, in fact, manufacturers who buy raw material and process it into a final product. A large investment of capital is necessary on the part of bottlers in order to build and maintain the required facilities necessary to the manufacturer of Coca Cola. Expenditures

for advertising are necessary in order to promote continued identification of trade name. Further, there was proof that the soft drink industry as a whole functions upon a system based on territorial exclusivity like that of Coca Cola. There is evidence to demonstrate that the soft drink industry is a highly competitive one involving 7-Up, Pepsi Cola, Dr. Pepper and many smaller national, regional and local brands. There was no evidence that the current system used by Coca Cola is restrictive of interbrand competition. Since the purpose of the antitrust laws is to insure that the "unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social instruction",[2] I find that the legality of territorial restrictions in this case must be governed by the "rule of reason" as set forth in *Standard Oil Co. v. U.S.A.*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911) and are not anti-competitive.

■ Nor can it be said that Tomac was injured in its business or property. Rather, defendant's actions may have frustrated Tomac from making a fast finder's fee for serving as the chain markets' vehicle on a one-time basis in the markets' effort to change defendant's method of doing business. Tomac was not and had never been in the business of distributing Coca Colas or any other soft drink. It entered the scene as an opportunist. Plaintiff was not and never has been a bottler or distributor of soft drinks. Its existence as an economic entity was that of a stalking horse for Alpha Beta and Certified Grocers. While defendant does not propose, nor does this court find that there was anything illicit in the arrangement made between plaintiff and the two large chain grocery companies, the evidence points out that Tomac would not have obtained the purchases from Taft had all of the Coca Cola bottlers been free from territorial restrictions. In other

words, absent the complained of restrictions, plaintiff could not function because there would be no place in the soft drink marketplace for a middleman like Tomac. Since plaintiff is unable to show that it would have fared better economically in a marketplace free of the alleged illegal restraint, plaintiff has failed to show that it was damaged. One is barred from recovery under the Clayton Act where no damages can be shown.

## THE BRADY RULE

■ "When the evidence is such that, without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict, the court should determine in the proceeding by non-suit, directed verdict or otherwise in accordance with the applicable practice without submission to the jury, or by judgment notwithstanding the verdict." *Brady v. Southern Ry. Co.*, 320 U.S. 476, 479, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943). Thus, the motion for judgment n o v may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment. *Shafer v. Mountain States Telephone Co.*, 335 F.2d 932 (9th Cir., 1964).

The motion to set aside the jury verdict is granted and judgment is ordered entered in favor of the defendant. In the event this order is reversed on appeal, defendant is granted a new trial on all the grounds used to support the granting of this motion.

---

**2.** *Northern Pacific Ry. v. U.S.A.*, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958).